and we will take up the Familia Vota v. Arizona. I was just checking to make sure the time was correct, okay. So, Mr. Langhofer. Good afternoon, Your Honors and Judge Gould. I'm Corey Langhofer for the Intervenor Appellants. I'm going to endeavor to sit down with four minutes left and I'll, of course, keep track of my own time. I'd like to, of course, I'm most interested in addressing the issues that are of interest to the Court, but without, I was thinking perhaps it's best to start with the mail-in voting provisions under the MBRA, the ruling lease under the MBRA. When registering voters, Arizona accepts and uses the federal form, full stop. The issue before you is about something that happens downstream of registration and for a subset of people who use the federal form. Sorry, before you get into the substance, my overarching question is, you know, it's no secret that the election is, what, 60 days away. What actually is live for this election that we, what issues are live for this election that we should be trying to expedite if we can, or is this all for a future election? Because I notice there's no Purcell briefing in the merits, so. Yes, so we thought about this carefully before bringing a stay application and in my client's view, the three issues that mattered for this election have already been resolved on the stay issue. So, I think the rest of. But which, okay, so what's, is any, are any part of the 2022 voting laws in, operating right now, in effect, going forward? Only. Right, as we said here. Right. The only one, and that's the one that is the subject of the U.S. Supreme Court stay. Apart from that, nothing has been. And that's the DPOC, right? That's the requirement of DPOC for the federal registration form. For the state form. Oh, excuse me, Your Honor, yes, for the, for the federal form, whether. For the federal form, for purposes of voting for president and for purposes of voting by mail, and for the state form for whatever other state election is going on. That's correct. Okay. So, the, the only thing that is live right now in Arizona is, as a result of this SCOTUS stay. Apart from that, it has not been implemented. So, is registration still ongoing in the state of Arizona? It is. It will continue for about another 30 days. I may be off just slightly in the calculation of that, but about another 30 days. So, I'm assuming you have some portion of your electorate who have registered pursuant to the NVRA and pursuant to LULAC and pursuant to the intertribal council decision by the Supreme Court, and some other portion of your electorate that is being put to these new requirements from the 2022 Voting Act. That's correct. How's that working? It, it's working exactly as the statute requires it. So, if, if you, you, you get to choose when you register which form you submit. If you submit a federal form, you will be registered even if you do not attach DPOC. That, you, you will be registered, we accept, and use those forms for registration purposes. And you will also be able to vote by mail and vote in the presidential election absent some action of this court that changes that, right? If you submit a state form, you need to attach DPOC if you want to be registered. I want to, just contextually, I want to make a point that I think is probably not clear from the briefs and from the trial court's ruling. When you read all these pages about DPOC, you probably have a sense in your mind that voters need to take their form home and go to their file and find their birth certificate and copy it and staple it. It sounds modestly burdensome. That is not what is happening when we're talking about DPOC. We're talking about something completely different. For the overwhelming majority of voters in Arizona, it means you write your driver's license number on the form, that's it. You don't have to copy it. You don't have to attach it. I think we understand that. Okay. I'm delighted to hear it. But isn't that all that LULAC was doing, too? It was requiring the county recorder's office to just check with the DMV. LULAC, as I understand it, required the county recorders to, in the absence of DPOC, search for it for the voter. If you left your driver's license number . . . I mean, it was almost, the way I read the case law, it's almost automatically done. You just search a database, a DMV. It's hardly automatic, Your Honor. It requires personnel to do that. And there's evidence in the trial record about how that search is done. So, if you . . . and it's concerning, the way that search is done. So, if a county recorder gets a registration form under the LULAC consent decree that just says, John Smith, and I was born on January 1st, they will search the driver's license database for a John Smith who was born on January 1st, and if there is one, they will assume, they'll sort of import the DPOC information for that John Smith born on January 1st, assuming it's the same person. When there's not affirmative evidence, it's the same person because the information's on the form. That's concerning. So, part of what the law does is tightens up your . . . it gets rid of the assumptions that someone with the same name and birthday is, in fact, the same person. There's more than 4 million voters in the state. Of course, some of them are going to have the same name and the same birthday. So, it sounds like your answer then is that nothing that we do is going to affect this election, right? So, we don't have to rush anything out. That is our view. Perhaps the state has a different view, but we've moved for a stay on everything we thought was urgent. That's been litigated. So, perhaps the briefing schedule's been unnecessarily expedited at this point. Okay. That's very helpful. I was starting to say on the mail-in voting issue, it does not affect all federal voters. In fact, it affects a subset, and that's because Arizona, by statute, has adopted a process that's very similar to what the LULAC consent decree required. So, four things have to happen for you to be affected by this mail-in voting issue. First, you have to choose the federal form. The voter has to choose that. Second, you have to not attach DPOC, not give that information. Third, when the state checks its own systems, using its own time, for DPOC and its databases, as it must do, statutorily, it has to find none of that. It has to be unable to establish that you're a citizen. And fourth, you have to not respond to the cure request that you get from the county. So, only voters who do that. They pick the federal form. They don't attach DPOC. They're not shown the records to be a citizen and don't respond with it to the letter. Therefore, they're registered as fed only. That is the subset of people who would not be able to vote by mail. It's a subset of the federal form. It is downstream of registration. They're absolutely registered to vote. They just can't vote in person. They must vote in person. And they can't vote for the president? The presidential, that's correct under the statute. I mean, isn't that the whole ballgame here is the presidential election? I mean, this upcoming presidential election? Well, I think that issue, from my perspective, as I was saying, is off the table. We won't get a ruling on that issue before the presidential election. So, from where I sit, that's not the ballgame at all. We're fighting about state elections. But they're not going to be allowed? The ones who have chosen the federal form and not provided DPOC will not be able to vote for the president? At the moment, that statute has not been implemented. It's been enjoined. So, they absolutely will be allowed to vote for president and do it by mail unless this court reverses the trial court before ballots go out, which the ballots have already printed, in fact. So, this only affects 2028? For president, yes. There won't be a presidential election between now and 2028. And they'll be able to vote by mail in this election? This cycle, absolutely, Your Honor. So, the – and I can – let me sort of slow down on that. That the plaintiffs will tell us otherwise if they think there's something not correct about what you're saying? I hope they do. If I'm in error, I hope they correct me. But the ballots in Maricopa County, which is 65% of the state's population, and Coconino County, I want to say it's 7%, have already printed. So, if you're a Fed-only voter, the Fed ballot that you get will include Congress and president. And the ballots will be mailed out 27 days before the election. It's about four weeks from now. Unless this court – Why the cert petition? I mean, why did you take it all the way up to the Supreme Court? The Supreme Court issued its stay the day the ballots printed. Because we had asked them, please decide this by the day ballots are printing. This is the urgency. They enjoined – they stated what they stayed. It didn't include the mail-in provision or the presidential provision. So, as far as I'm concerned, those issues are gone for this election. No need to rush on that. I'm thankful to hear that. I say, let me sit. Bringing to another issue that gives me the hardest – is the hardest question is the 90-day provision. To me, that provision of the National Voter Registration Act is pretty broad. It says any program to remove ineligible voters has to be done within 90 days. So, how do you square that with the periodic check that Arizona wants to do? I think that actually tees up perfectly the problem with the plaintiff's – the plaintiff appellee's position in the district court. If you look at subsection A3 of the 90-day – the NVRA list maintenance provisions, including the 90-day blackout period, it says a state cannot remove a name from a voter roll unless it fits into one of these categories. Those categories include deceased, the person requests to be removed, they move out of the jurisdiction, they're a felon, or they're incapacitated. It doesn't say – I'll remind you – it says you can't remove them unless they're in one of these categories. Then it goes on with details. It does not allow for removal for non-citizenship. It doesn't talk about that. Our position is that removal for non-citizenship can't be preempted because the NVRA blackout period just isn't dealing with removals for this reason. So there are two ways around this. If we're to read the A3 on its face that says you can't remove but for these reasons, there are two ways out of that problem. One way is the Sixth Circuit solution in Marinko where they say, fundamentally, what the NVRA is protecting is people who were properly registered, but now you're trying to deregister them. I actually think that's wrong because A3 says registrant, so you can only move registrants for those reasons. That's not the same thing as an ineligible voter, which the statute uses specifically in the 90-day part. Those mean different things, or those are different words. Why would they – they don't mean the same thing. The A3 is concerned with the idea that someone is registered, and you may be trying to remove them, but they're eligible. And then when we get to the 90-day provision, it's, I think, more concerned about they may be eligible, but doing this at the last minute is unfair to them. So the subsequent sections are – Actually, they're just different words. And so A3, you could – registrant to me means an eligible applicant that is registered, which follows A1, right? But the 90-day part says ineligible voters. So it does make sense that you could only remove eligible voters for those prescribed reasons that you talked about. But when you get to the 90 days, all programs have to end because it says ineligible voters, which is broader than registrants. So let's say the Marinko argument is not well received. The second path out is the general program description. So if you – our position is this. This is a facial challenge. We have to assume the statute would be properly enforced. We're not in the as-applied stage yet. The statute says if there is a confirmed non-citizen, confirmed non-citizen, then you contact them and say, we have confirmed that you're not a citizen. You have 35 days. Here's a postage-paid envelope. Tell us if we're wrong. And when you have a process that confirms non-citizenship, gives proper notice, and an opportunity to correct the record, that is not general. That's individualized. And so we're not in the general program anymore. The second path out of this problem, where states must be permitted somehow to remove non-citizens, is the individualized program. I candidly don't know what you could do more than that. You confirm it in your records. You contact them. You make it free for them to respond. You say, please respond. You've got 35 days. That's a long time. I don't know what else can be done. And perhaps I'm missing something. But the systematic part, aren't they comparing the voter registration roll with, what, SAVE, the SAVE database? So that seems systematic. That's the, to me, problem. So I think that the SAVE is a good starting point. But the statute requires confirmation. We don't yet have from the Attorney General's office or from the Elections Procedures Manual rules on how this would be implemented, because it has not been implemented. But let's just thought experiment here. What if the rules from the Attorney General say you start with SAVE, and if that indicates that a person's a non-citizen? I'm going to pause there. First of all, the trial court rightly found that SAVE is reliable. It is the most authoritative database, distinguishing between naturalized immigrants and people who are here without status or without citizenship, let's say. So if SAVE says you're not a citizen, that's indicative. But then you can look at the MBD databases. As you've read, there is some chance of error in SAVE. It's de minimis, I think is fair to say, but there's some non-zero chance. If the person's registered to vote, the Arizona voter registration system will save an indicator of proof of citizenship for that person if it ever exists. It's sort of overriding an error in SAVE. And for two years after you register, the county recorders have to keep proof of your citizenship. And so you can say, sure, let's start with SAVE, but then it will run it through the battery of other indicia we have and see if they're all consistent. If there's one indicator that the person's a citizen, it's done. If you get to the end of it and all of the evidence you have is not a citizen or no evidence of citizenship, that sounds like confirmation. Well, the problem is that still sounds systematic. You go from one database to another. Anyway, can I move on to another question real quick? The other part that's giving me heartache is the reason to believe and then whether or not that violates the CRA. Because my understanding is if there's a reason to believe you're not a citizen, you must consult the SAVE database. And the SAVE database only includes naturalized citizens. Is that right? And you have to use the A file number to get that information. The last part your Honor said is wrong. Okay. And I think that there's a lot of evidence in the district court on this. There's one document that very clearly establishes SAVE does not just include naturalized citizens. The district court's opinion on this, I think, was written with less than perfect clarity. But I point you to Exhibit 271. Unfortunately, this is not in the excerpts of record. I apologize for the inconvenience there. There are things in the excerpts that are close, but Exhibit 271 from the trial court has this. SAVE includes a body of data about people who were not born in this country. Many of them are naturalized. Many of them are not. So if you're an SILE. Well, that's still a limitation to it. So basically, if you're born in this country, you're not going to be in SAVE. That is correct. You should not be. So then how does that not violate the part of CRA which says that it has to be uniform with how you qualify other individuals? Yes. Because you can never qualify a U.S.-born voter through SAVE. That should be correct unless there's some sort of error in the paperwork. That should be the way it is. Our position on this particular question that you're asking is that provision in the CRA has never been applied to invalidate a statewide statute because fundamentally that provision, the different practices provision, is about local jurisdictions applying the statewide laws improperly, unfairly in some way. As long as you have a statewide uniform system, and you've read it, it's defined in statute, that is uniform and that is compliant with the CRA at least. I see that I'm down to two minutes. I've exceeded my own goal. If you don't mind, I'll reserve the balance. All right. Thank you. Let's see. Mr. Whitaker? Good afternoon, Your Honors, and may it please the Court. Josh Whitaker for Arizona and its Attorney General. I plan to use six minutes, and I doubt I'll have much time for rebuttal. I'd like to start maybe with the question that you asked about how quickly should we decide this. I think Mr. Langhofer described it generally correctly, but just to make sure we're on the same page, there's federal form applicants, and part of these laws say if you're a federal form applicant and you haven't provided proof of citizenship, you can't vote for president or by mail. The district court enjoined those laws, and the Supreme Court declined to upset that injunction. So those laws are on hold. The part of the law that is now in effect, and I'm sure plaintiffs will talk about this more, is the part involving state forms. There's part of the law that says if you're going to use a state form and you don't provide proof of citizenship, then we're going to reject your application. So at a minimum, that will eliminate what we call the federal only voters from state form applicants going forward. State form users? Yeah, so state form users, as a result of this law, will no longer become federal only voters. They don't vote at all? Well, if they provide DPOC, they'll be fully registered. If they don't provide DPOC, they won't be registered. There's some question right now as to how exactly to implement that. That means they don't get to vote in November, right? So, yes. There's some question about how to implement that going forward because of how to mesh that law with ARS 16134B, which says that, hey, if proof of citizenship is supplied at some point, then you can vote. So there's a question right now about how to implement those two laws jointly. So, for example, if someone fills out a state form and the county recorder can easily view that the person has proof of citizenship given to the state, what is done about that situation? So I'm just alerting the court. That's quite a bit of uncertainty. Isn't that contrary to this Purcell principle of not creating such uncertainty in the immediately preceding an election? That's quite a bit of uncertainty coming from the Attorney General's office. Your Honor, I'm not here to argue that position. I just was trying to let the court know we're not appealing that issue. I'm just trying to let the court know what the state views about the situation right now. Do you agree, though, even if we ruled on that issue tomorrow, there's not enough time to get that through the appellate process, the Supreme Court process, before this election? I think it would depend on how the court rules, Your Honor. If the court were to say we're going to go back and put in place the district court's injunction, I think that would be relatively easy to implement because that's essentially what had been happening before. But there's a stay before the Supreme Court. Right, of course, and the court must respect the stay pending appeal. The stay's there until we issue a decision on the merits. Yes, it's a stay pending appeal. I think it's a stay pending cert petition. No, it's a stay pending appeal. You know, I'm out of my league here. I'm sorry. It's not even my issue. I just wanted to try to provide some clarity. What is your issue? Okay, so my issue, the main one, is much simpler, actually. It's birthplace. So very quickly, there are five undisputed facts about birthplace that I think are relevant here. I think the big question is materiality. Yes, exactly. Let's get to it. Okay, so materiality. I heard counsel for the United States in the previous argument say that it's a mixed question of law and fact. He was suggesting it means capable of influencing the decision maker. I heard defense counsel in the previous argument say it's a question of law. Regardless, here it very clearly involves legal principles. It's essentially a statutory interpretation question because you're interpreting the federal materiality provision and whether it preempts the state law requiring birthplace. So what Arizona is proposing to do is say, okay, from now on, at least for state forms, there's already been a field on the form to write your state or country of birth. At least in the last few decades, that's been optional. We would like to require it going forward in a way that is if someone refuses to fill it out and then gets notified and says, hey, we saw you didn't fill out this form. Please fill it out, and still refuses to fill it out, then Arizona would not register that person. And that is material both to proving identity and to proving citizenship. Birthplace is basic biographical information that virtually everyone knows about themselves, and it's also not the sort of thing that you can learn about someone else just by observation. It's commonly requested on government forms. The United States State Department has long required it for passports. In fact, it calls it integral. Can I ask real quickly before you time out? You're not defending the checkbox. Is that on purpose, or does Arizona have a position on that? We decided not to appeal the checkbox. We think, candidly, that the materiality of birthplace is stronger than the materiality of the checkbox. I think our briefs explain this very well. I'll quickly say that our reply brief, very much running out of time, but our reply brief carefully considers each objection raised by the plaintiffs and by the district court. So if the court has questions. The problem with the birthplace, I think it's the record before the district court, was that predominant answers were Arizona, Mexico, or the U.S. And what does that tell you? So it's true that the United States has most answers. I think that overstates the record. But many answers were Arizona, Mexico, or the United States. It still tells you something. It still means that if someone, for example, were trying to use someone else's identity and register as that other person, they're still not sure what the birthplace would be. I, for example, maybe you'd guess I was born in Arizona, but I was actually born in upstate New York. It's information that's like security-related purposes, that admittedly it's not the most fine-tuned information, but the materiality provision doesn't require that. It doesn't go to the three criteria for eligibility to vote. So identity is a basic qualification to vote. The person who fills out a registration form must be the person that they say they are. That's vote.org, the Fifth Circuit case. It's viewed as an implicit qualification in any registration context, which makes sense. There's an Arizona statute, ARS 16-183, that criminalizes knowingly registering as another person. It's a very fundamental feature of registration, that if you're going to submit a registration form, you are who you say you are. I take it back. You were right. It tells cert. So would there be time if this court were to do something to do another cert petition and get to the nub of this issue? Your Honor, I just haven't. Or, I mean, it seems of concern. So I guess I would say this. Before the Supreme Court stayed that provision, county recorders had been following the status quo until then. So assuming this court were to reach a merits decision that joins the provision again, county recorders have in recent memory how to operate in that situation because they were already doing it. I don't know if that answers your question. Can I ask you what the 2023 Voting Procedures Manual provides? Sorry, say that again? The 2023 or the operative Voting Procedures Manual. What does it provide? Doesn't that ordinarily? Yes. Isn't that binding as Mara Braw? Yes. The 2023 Elections Procedures Manual has not accounted for the recent Supreme Court stay because it was issued at the end of 2023. And at that time, the district court had declared this statute unlawful. So in light of that declaration, the 2023 Elections Procedures Manual was following what had been happening before the law even was enacted. Right now, obviously, the Supreme Court has stayed that injunction. So now the law is being treated as in effect. So now there are questions about, okay, how are we going to start implementing this? And I'm way over my time. Can I ask one more question? I'm sorry. Sorry. You know, you mentioned the problem with the factual findings of the district court on the materiality provision. To me, that suggests that this shouldn't be a preemption statute. You know, it says no person shall do this. Just because the district court made a factual finding that in some cases, most cases, doesn't mean that this provision can't be enacted in a way that doesn't violate the materiality statute. Doesn't that suggest that we should not use it as preemption and use it and it's meant to be a cause of action after it's actually been violated? I don't think we've developed that argument, but there's a related point, Your Honor, which is when federal courts consider pre-enforcement challenges to state laws, you should try to be charitable and assume that it will somehow be implemented in a reasonable way. So an example of that is when the district court said, Arizona hasn't yet given a plan for how it's going to standardize the answers. Well, the law hadn't been implemented yet. I mean, the district court, I think, was expecting more of the state than could be reasonably expected in a pre-enforcement challenge is how I would answer that. Thank you. Thank you, counsel. Good afternoon, Your Honors, and may it please the Court, Jonathan Backer for the United States. In my time today, I will address the United States' NVRA claims about the presidential and mail voting provisions, and I'll also address our materiality provision claims on the birthplace issue. Ms. Lange will address the non-U.S. appellees' claims, and Mr. Herrera will address the Promise Arizona plaintiff's cross appeal. May we just preliminarily get an understanding? Is your understanding the same as what is going on in Arizona right now? So I definitely agree that the injunction is still in place with regard to the mail and presidential voting provisions. On the LULAC consent decree, state form stuff, I'll defer to Ms. Lange on that issue because that's not our claim. But diving into the presidential voting provisions, no one can test that those provisions are consistent with the NVRA's accept and use mandate. The only issue that the NVRA says is that Congress has no power to regulate presidential elections. Now, of course, that argument is foreclosed by this Court's precedent in Wilson. It's also foreclosed by the Supreme Court's precedent in Burroughs. So that settles that issue. I'm not so sure it's that settled. So Burroughs itself mentions that there's an exclusive province for states in presidential elections, right? For choosing the method of appointing presidential electors. So you can choose between appointment by the state legislature, for example, or popular election as all states have decided. But what Burroughs holds is that once we're in election land and there's presidential elections, that Congress has power to regulate presidential elections. And that was the campaign finance. Well, that was campaign finance, not the actual running of an election. Well, sure. But campaign finance is part of running an election. It's part of the manner of running an election. If that is part of Burroughs, this is how Burroughs describes the power. It says, the power essential to preserve the departments and institutions of the general government from impairment or destruction. Now, if campaign finance falls under that fairly broad power as it's described there, well, then surely safeguarding suffrage itself, as the NVRA does, falls within that power. I'm not so sure I see that. Campaign finance is regulating how the candidates spend their money. But how states run their actual voting is a very different thing. Well, Your Honor, I would argue that that rather capacious power must inherently ‑‑ I mean, suffrage itself is about who the electorate is. That's fundamental to ‑‑ Sure, but the Constitution said it goes to the states. No, it said the manner of appointment. So is it going to be the method of appointment? Is it going to be a popular election as it is in all states, or is it going to be something else? So your view is that if once the state chooses a direct election, then the federal government can legislate everything else? Well, the manner of ‑‑ The government. The manner of those. As this Court said in Wilson, that it's a power on par with Congress's power under the Elections Clause. What do you mean by that, what they can do once the state chooses direct election? Well, they can't change the method of election. But when it comes to the manner of elections, that's what Burroughs holds, and it's what this Court held in Wilson. But even if Your Honor disagrees, there's also the power to enforce the 14th and 15th Amendments, prohibition against racial ‑‑ Well, I'm glad you think so, Your Honor. But, you know, Congress, you know, held that restrictive ‑‑ found that restrictive voting laws were adopted with the purpose of preventing disfavored groups, including black Americans, from voting. And it found that racial disparities persisted in the 1980s and 1990s. So there's a sound basis to conclude. My only problem with that, then, though, is the District Court made no ruling on that. So shouldn't we just remand for the District Court to consider the 14th and 15th Amendments? Well, I think that because the Katzenbach Inquiry is just based on the legislative history, essentially, and what Congress was thinking when they enacted the statute. But there's a dispute about that, too. So should we let the District Court all handle that? I don't think so, Your Honor. I think it's a legal inquiry because this is based on the findings, Congress's findings and the legislative history. So I don't think that's necessary. Is congruence proportionality, is that a purely legal inquiry? Well, to be clear, Your Honor, it's not the congruence and proportionality. It has the Katzenbach assessment. And the interveners, you know, forfeited any argument that congruence and proportionality would apply by not addressing that in their reply brief. Do you know, is that a purely legal question or is that a factual? I think that's a legal question. But moving on to the mail voting provisions, what the Supreme Court held in Inter-Tribal Council is that states must accept the federal form as a complete and sufficient voter registration application. And what HB 2492 does is it essentially gives partial credit to federal form applicants. It says, sure, we'll register you to vote, but as a part of the registration process, we're going to determine that you are ineligible to vote by mail. And so that is inconsistent with the accept and use mandate. And that impulse is confirmed by the portion of the NVRA that outlines one narrow way in which federal form voters can be treated differently with respect to federal mail voting. So is it the government's position that that's the only additional requirement that all states can add to mail-in voting? Well, if it's tethered to the registration process as it is here, I mean, the federal form— So let me give you— You know, like some states require you have to prove that you're going to be out of town for some reason.  So you don't think that's preemptive? NVRA would not affect that. The problem here is that it's giving partial credit to the federal form applicants when it comes to mail voting and saying what modes of voting can you engage in. If it's just an excuse regime and that applies neutrally to all voters, then the NVRA would have nothing to say about that. But that's not what we have here. So what's the problem here, then? They're just saying all voters have to provide DPOC to vote by mail. Because as we know from Intertribal Council, DPOC is something in addition to what the federal form requires and what the HB 2— But then why can't it just be a condition on voting versus a condition on registration? I'm sorry? You said conditions on voting are fine, right? So why can't DPOC be considered a condition on voting? Look at the way the statute is structured. It's saying as part of the voter registration process, if you're a federal form applicant, you need to provide something in addition to what the federal form requires at registration in order to even be eligible for mail voting. The state has made a choice to, A, provide absentee voting, and, B, to make the determination about whether someone is eligible to vote by mail as part of the voter registration process. And it requires something additional from federal form voters. But I guess that just seems a little inconsistent with the part that says that states can require you to vote in person for the first time, because that's not a registration issue. Sure, so that's a specific carve-out in the NVRA that says federal form voters can be treated differently in one discrete way. The state can actually treat federal form voters differently when it comes to mail. That's not a registration issue. That's an actual voting issue. Well, however the state structures it. That's the exclusive condition on voting. It carves out a narrow way in which federal form voters can be treated differently, regardless of what stage of the process it comes. And this is something that goes beyond that and says we're going to treat them differently, not in that one narrow way. I see the amount of time. I would like to address the birthplace requirement, if that's all right with your honors. All right. Go ahead. So the district court did not clearly err in finding the birthplace plays no role of consequence in determining voter qualifications. The materiality provision provides the standard that applies to this claim, is that no error or omission can deny the right to vote that is not material to determining voter qualifications. And at trial, election official after election official said birthplace is not used to determine voter qualifications in Arizona, and that's backed up by when it comes to citizenship, you have DPOC already for all state form voters, so there's no need to further inquire. But I guess my problem here is, like, couldn't there be one situation where birthplace would be relevant? For example, you know, if they put a different birthplace than what's in the DPOC, wouldn't that be relevant? Well, I don't think so, your honor. That seems like it would just be a mistake because you have in hand actual physical, what the state says is satisfactory evidence of United States citizenship. Wouldn't a reasonable registrar be more, like, give it more scrutiny? Well, I don't think so, your honor, because, again, you have the physical document in hand, and really if that was the goal, it would be a rather poor fraud deterrent because the voter has the document in hand that says, you know, what their birthplace was and then basically just didn't copy it down correctly. So it wouldn't be a very good fraud detector if that's what the purpose is. It just suggests that it's not really a preemption question. It should be a case-by-case set. Because if it's possible that one method is material in one case, then why would we strike down the whole statute? Well, because I think in this instance that facially the evidence at trial shows that there is no significant role that birthplace plays, either significant. That's what the state agrees. There is a case. It could be. The state hasn't identified, didn't identify one at trial, and the district court found that they didn't. So that's citizenship. And, you know, briefly with respect to identity, I mean, Dr. Hirsch's testimony shows pretty conclusively that birthplace is almost never going to be determinative in identifying duplicates, which is mainly what the state hangs its hat on. And even so, finding duplicates isn't determining whether or not a voter is qualified to vote. It's really an administrative process of cleaning the file. So thank you. We'd ask the court to affirm the district court's permanent injunction of HB 2492 and its presidential and mail voting provisions and its citizen checkbox and birthplace requirements. Thank you. Thank you, counsel. Ms. Lang? Was there any evidence in the record before the district court as to the percentage of the electorate who fills out the federal form versus the percentage of the electorate who fills out the state form? Yes and no, Your Honor. So there's not exact percentages, but there is a great deal of testimony to say that the vast majority of applications that come in paper forms come from the state form. And that is consistent testimony from county recorders, from plaintiffs who do voter registration drives, from the election officials across the board. So we don't have the data on kind of 90% versus 10%, but the vast majority of paper applications are through the state form. And the registration that's taking place now up until 30 days, I guess, before the election, is that just new voters? Yes, Your Honor. I think so, if I understand your question correctly. People who are registering right now are largely new voters. They may also be updating their voter registration if they've moved or whatnot. For the most part, those folks should not be affected by documentary proof of citizenship requirements because they should already have DPOC on file. There are some exceptions having to do with really old registrations or whatnot. But for the vast majority, we're talking about new voters. And I think that that actually goes to one of the questions you were asking, Your Honor, about could you attach the DPOC requirement just to mail voting as a neutral rule about mail voting. I think the answer to that, at least as to the NVRA, is yes. I mean, there would obviously be different legal questions or potential challenges. But the answer is yes. The reason why this statute is not okay is it plainly does not do that. In fact, the registration statute that requires DPOC grandfathers in all registrations looking backwards. So it is certainly not the case that everyone who votes by mail is required to provide DPOC. A huge percentage of the population does not have to. And that's why the NVRA preemption argument matters so much here because the NVRA was about making new entrants, new registrants an easy process. But instead, what we're doing with this statute is saying that new registrants are going to be penalized. They are not going to be treated the same way because of the way that they registered. So it's a completely different circumstance than a kind of mail voting rule that required DPOC for everyone who wants to vote by mail. So have you been agreeing with what everyone's saying that nothing we can do will affect the 2024 election? I think that's right, Your Honor. Unfortunately, because the Supreme Court did make it pending not only this decision on appeal, but also their decision on cert, I do think we are kind of where we are for good or for bad, obviously.  And I will say that, you know, I'm privy to my clients working hard on the ground to make sure that federal form applications are more available. Of course, this is the type of thing that we think would be really important to have been in place well before, you know, the 60-odd days before an election, but here we are. But I do think that I want to talk a little bit about that issue of the DPOC for state forms going forward and documentary proof of residence for state forms going forward. And here, I think that the interveners run into the same, well, let me back up and first talk about the LULAC Consent Decree. I think the problem with the LULAC Consent Decree issue for the interveners is that we're just in the wrong procedural posture. The interveners have never sought to put aside the LULAC Consent Decree. I mean, the LULAC Consent Decree has expired, or his jurisdiction, that district court judge's jurisdiction over the LULAC Consent Decree has expired. It still has the force of a binding judgment as to the parties involved, but could non-parties attempt to modify the LULAC Consent Decree at this point? A number of cases that we cite show that they can, including the Horn v. Flores case, which actually involved Arizona officials intervening to modify a consent decree. Another case we cite, Agostini, was a new group of parents that were not involved in the original case intervening and then moving to set aside a consent decree. So there are a number of cases cited by interveners. They all are in the posture of a Rule 60B motion to set aside the consent decree, and that makes good sense because then that court will have to consider, okay, are there changed circumstances? Are those changed circumstances relevant to why we entered this federal permanent court order in the first place or not? So why couldn't you construe the intervention as a Rule 60B motion? Well, Your Honor, because it wasn't a Rule 60B motion. You could construe that they did it all the time. So interveners have never argued that. They have also never actually argued. In addition to not bringing the right procedural posture, they have also just not made the right legal argument. They have made two arguments about why the LULAC consent decree cannot be applied. Both are plainly wrong. One is that the consent decree no longer has any force because of the end of the continuing jurisdiction. This Court's cases say that that's plainly not correct. So do a number of other circuit cases. It's a final permanent binding judgment. And the second is that they argue that a consent decree cannot supersede subsequent legislation. That's obviously wrong, too. If you look at a case like from the Ninth Circuit hook where there was a consent decree about prison conditions, part of it had to do with how the state was going to pay for certain things. The state passed—Arizona passed a statute trying to, you know, basically overturn that consent decree. And this Court said that no dice. They can't do that. Now— So how could they have gotten out of the consent decree? You're basically saying there's no way out. I'm not, Your Honor. What I'm saying is that it's not the mere fact that there's subsequent legislation that could. It's a new State law cannot necessarily mean that a Federal consent decree is no longer any good. Now, but they could have argued— I thought you said 60B would work. And 60B is a change in law, right? So here there's a new law. It's a new State law. Why can't that be a basis for a Rule 60B motion? It could. Let me try to explain, Your Honor. So Rule 60B is the right procedural mechanism. Then the question is what argument do they need to make? It's not enough to just say we changed the law so we don't have to follow a Federal court order anymore. That's the supremacy clause, right? But they could argue, actually, we've changed the law, and this consent decree isn't solving for any constitutional problem. There's no underlying Federal constitutional problem that this consent decree solves. And in that context, because there is no Federal constitutional reason for this consent decree, therefore the changed circumstances of this State law should—the State law should go into effect. If the consent decree was entered because there was a constitutional violation, and then how is that ever going to change? Well, quite frankly, Your Honor, if there's a constitutional— well, if there is, in fact, a constitutional violation, if it is, in fact, an equal protection violation to treat these equally, then, yeah, no State statute is going to change that. And that's just the law. You're basically saying Arizona is stuck in the LULAC consent decree forever. For the same reason that if this Court put aside the consent decree, this statute exists. If this Court determines that treatment of Federal and State forms violates the equal protection clause, then, yeah, that law would be enjoined. So what they would have to argue, and what Horn v. Flores and a number of other cases say, is you have to argue that there isn't some ongoing Federal constitutional harm. And I think they could very well make that argument. They just never have. In fact, they do argue kind of in the alternative. I mean, they should go back to the district court and make that argument if they want. Absolutely, Your Honor. I think that, quite frankly, at this point it might be forfeited. But, yes, this is the wrong forum and the wrong posture to be considering those arguments. With respect to the documentary proof of residence requirement for State forms, interveners have not made much argument, but what they have argued is essentially that you should take the word necessary in the statute and instead make it mean something like bare minimum relevance. And they have also said that they've adopted the argument of the dissent in ITCA in saying that we should defer to States on what is necessary. But the dissent tells us what the law isn't, not what the law is, of course. And what we know is that the law about what is necessary, it has to mean something. And they've put forward no evidence to suggest that documentary proof of residence is necessary. In fact, all of the evidence cuts in the opposite direction. The Court's reasoning is just because the grandfathered in voters don't have to prove it, is that it? No, Your Honor. The Court was, if you look at all of the factual findings from the case and kind of consider the District Court's decision as a whole. There's one section on necessary, and it only cites that issue, right? She says that they have not met their burden, and then she goes on to cite that specific example. So I don't think that's correct, Your Honor. There's a first burden, there's a finding that they have not met their evidentiary burden that it's necessary. You look at the record, that is plainly the case. What we know is that not only is there an attestation of penalty under perjury, but there's a complex GIS software system where every address on a voter registration form is verified. And that is a system that has been developed to adapt to rural Arizona, to the fact of nontraditional addresses, and the documentary proof of residence. And there's no evidence that that system is not working. There's one citation in the intervener's brief suggesting that it's necessary. It actually cuts against interveners, because what that citation is, is to folks alleging that folks don't reside, that there are registrants that don't reside where they reside, when in fact that was wrong. The election official says, no, these people just don't understand how Arizona works, and we have all these campers, and these are folks who live in campers, and they very much are residents. So there is all this evidence on the front end that we have a system that's working well and is well calibrated. All of the election officials saying we don't need this, and in fact this is going to muck up our system and make it very difficult to administer. And we have no evidence on the other side. And that's the evidentiary burden that the court was looking at, and then kind of added, and this statute is kind of internally nonsensical, where you'll accept an attestation for people who you have actual evidence live elsewhere, but for new registrants you won't accept that attestation. I think that was a very reasonable inference for the court to make. I do want to pivot quickly to two provisions that you asked about, Your Honor, the 90-day provision and the reason to believe. And I think, Your Honor, it hit the nail on the head when you said, you know, this language is pretty darn broad in its scope, and yet defendants want you to take any program and turn it into one program, a general program about people who've moved. Of course, if they wanted to say the general program we discussed in the earlier section, they could have just referred to the general program. Instead, they said any program. And I think your textual hook of saying that, you know, registrant and ineligible voters is quite sensible. And quite frankly, that earlier provision that Mr. Langhofer was talking about, you know, has been interpreted to also allow removal of noncitizens because, quite frankly, it would cause a constitutional problem if it wasn't. When you're talking about the broad 90-day language, it's plain as day as to what it means. There was also a kind of reference to the Marinko case, but I think the Marinko case is actually, you know, once again, cuts against intervenors for a couple of reasons. One is it wasn't a 90-day case. It was about whether or not removals are permissible. If somebody is not eligible and never was eligible, the answer is yes. But it also shows you what an individualized inquiry would actually look like. So Marinko had individualized hearings. They didn't shift the burden to the voter. The burden stayed on the challengers to kind of show a bunch of individualized evidence. This voter is ineligible because we have an affidavit. We can show all this information about why this person specifically is individually ineligible. That is plainly not what's happening here. And the idea that just because you kind of send a notice to voters, that that would somehow take it out of the systematic world of the 90-day provision is not only kind of nonsensical, but it is belied by intervenors' argument that the quintessential 90-day program that's barred is the general program about removing folks who've moved. But that requires an individualized notice. So plainly an individualized notice is not enough. And intervenors also make an argument that the language that says that you can't remove someone unless you confirm that they're a noncitizen, that that would make it an individualized inquiry. But if you look at ARS 16-165K, what you'll see is a definition of confirm, which is just about looking at more databases. So it's all systematic, and there's nothing individualized in any of these statutes. On the reason to believe provision, intervenors' primary argument is that statewide statutes are immune. There's nothing in the text of the statute that would suggest that. In a 1965 Civil Rights Act, I'm not sure why we would think that discrimination enshrined inside a statute instead of at a local level would be any more immune from the reach of the federal government. The federal government at that time was equally concerned with discrimination at the state level as it was with the local level. And one kind of fine point on that is the quintessential example that intervenors point to of a materiality violation, which is they make the same argument in the materiality context that state statutes should be immune. The quintessential example they provide is kind of having to provide your birth date in, or your age in years, months, and days. That was in the Louisiana Constitution. That was not something that was kind of being done at the ad hoc level. It was a state statute, and that doesn't make it immune from the materiality clause. And that same argument fails as to the reason to believe provision as well. I see I'm well over my time, Your Honor, so if you have no further questions. Do you? No, sorry. Thank you very much. Herrera? Good afternoon, Your Honors. I'd like to reserve a minute of my time. I know I don't have very much, but yes. There's no reserving at this point. Oh, I see. Maybe. Why don't you just tell us what you have to say? Of course. Good afternoon, Your Honors, and may it please the Court. I am Ernest Herrera, and I represent Promise Arizona and Southwest Voter Registration Education Projects, cross-appellants in this case. And thank you for the additional five minutes today. The District Court correctly cited Arlington Heights for analyzing whether Arizona enacted House Bill 2243 with the intent to discriminate against Latinos. However, the District Court clearly erred by requiring direct evidence of animus toward Latinos at every step of the Arlington Heights analysis. I will first address how the District Court erred as to its overall analysis, how the District Court failed to consider some of its findings as impact evidence, and how the District Court erred as to the other factors, legislative history, contemporaneous statements of legislators, and substantive and procedural departures. Before you get there, can you talk about your standing? Of course, Your Honor. Especially after a Hippocratic. Of course, Your Honor. The simple way to explain it is our clients were not doing a spending spree of advocacy after the law was passed in terms of advocating against the law. The resources having to be diverted by both of our clients are on addressing people who receive a notice and having to get ready for addressing such notices. So working, spending time with individuals who they've signed up for. Well, the notices that would go out under this law, Your Honor. Yes, sir. So, Your Honor, the notice would be sent out if someone is flagged by a database comparison. And so our clients would be spending money to have to actually, if it's someone they signed up to register to vote, they'd have to help them with that. Doesn't that only confer standing once your client receives that notice? If there's a threat to, if there's an immediate threat to them being able to receive it, then that accomplishes standing here. I don't know if that's organizational. I think you have to divert resources before. Anyway, go ahead. And then for Promise Arizona also has standing, representational standing. So its members are naturalized citizen voters who Promise Arizona actually helped prepare for the citizenship test. And so the members, the actual members of Promise Arizona, are people who Promise Arizona prepared to become citizens. And then once they became citizens, registered, helped them register to vote. And so those, they would have representational, associational standing. May I just ask you a question, having heard what we've heard with what's going on with the state form? People have registered on the state form, which sounds like it could be some of your clients or Promise Arizona's clients. Are any of them currently getting notices that they need to somehow submit DPOC to the state? As a function of 2492? As a function of these new laws? No, not that I'm aware of, Your Honor. However, I should say that Promise Arizona Southwest Voter, because we sued before the cases were consolidated, we are only challenging House Bill 2243, the registration and maintenance provisions. Okay. So I can't speak to that for any of the other plaintiffs who sued on 2492. Okay. So then on your issue, what's the best evidence of discriminatory intent? I wouldn't say there is one piece of best evidence, Your Honor, because the point of Arlington Heights is looking at the evidence as a whole. But evidence is that there is a climate of baseless accusations that people are not only not citizens registered to vote, but are illegal immigrants trying to vote. And that climate didn't stop at President Trump on his January 6, 2020 speech or Rudolph Giuliani. It extended into an organization, Arizona Free Enterprise Club, that was a champion of these bills, wrote these bills, and made sure they got passed. And especially 2243 made sure after it got vetoed by the governor, got dumped into a shell bill and passed. And that organization sent out a mailer to legislators at one point saying, not characterizing people as non-citizen voters or potentially not having proven their citizenship with documents, so DPOC, but saying that they were illegals, using the term illegals versus something like non-citizens. And that was the Arizona Free Enterprise Club? Yes, Your Honor. And do we attribute Arizona's actions to what this club did? I mean, why is that? They're not a government entity, right? Well, that is one aspect of it. Well, one aspect of it, Your Honor, is that the legislature relied on the expertise of the Free Enterprise Club in this case. When there were legislative hearings on, for example, HB 2492, when there were questions from other senators about what this bill would do, the question from the main sponsor was, well, let me let Mr. Blackie, one of the main lobbyists, answer that question for you. And so in addition, so besides Free Enterprise Club, there were also a statement by Senator Borrelli to Senator Quesada saying essentially, it's the people in your neighborhood that are doing this. That's why we need to pass these laws. Again, that was an accusation not of, oh, maybe you're someone who hasn't proven up to our satisfaction, your citizenship, but it's someone who we think is breaking the law here. Without any evidence to prove that, there has been no evidence of non-citizen voting, except in a couple of cases over the last 20 years. And we have that on testimony from two members of the Attorney General's Office who worked on that specifically in this case. And, I'm sorry. Isn't another piece of your evidence that the legislature itself did an investigation into the 2020 presidential election and found that there was no fraud? That's correct, Your Honor. So these laws were passed in 2022. And of course, the election, November 2020 election happened. There was the speech by President Trump in January 2021. And during that year, 2021, there was an audit, or it was called an audit, but it was a committee formed by the legislature to examine whether there was widespread or any kind of non-citizen voting occurring in Arizona, whether it happened in 2020. And they simply found no evidence of that, Your Honor. That could cut the other way, though. It shows that the legislature is really concerned about voter integrity and election integrity. Just because they didn't find it in that particular instance suggests that they care about it. That's true, Your Honor. We wouldn't disagree that there was a genuine interest in that concern. However, there were interveners and defendants, and I see I'm over my time, but if I can answer this question. Join the club. Yes, Your Honor. Thank you. Interveners and defendants, especially defendants, make a big deal of the guidance that was issued after these laws were passed. And after, frankly, a month after we had this trial in this case. And this guidance helped, as the district court found and as the attorney general argues, helped clarify some issues in the statute that were lacking. However, there was guidance before these laws were passed that in addition to the existing law, in addition to the administrative actions and prosecution of voter fraud that existed to prevent noncitizen voting. So to go to pass a law in the form of HB 2243 that has provisions that functionally are almost facially discriminatory in how they function, that is not how you address a concern, something that's already in process of being addressed. So I hope that answers your question, Your Honor. Thank you. All right. And with that, I think I've gone over my time. But I will conclude that if it is the district court require that plaintiffs provide direct evidence of nefarious intent toward Latinos for every factor of Arlington Heights. So by requiring directed evidence, for example, well, I'll conclude there, Your Honor, just to say that the Arlington Heights test, its purpose is to look at circumstantial evidence, not direct evidence. And we believe that is where the district court erred. And we ask respectfully that this court reverse the district court's declining to find discriminatory intent. All right. Thank you, counsel. Mr. Langhoffer, I think you said some time. Thank you, Your Honors. A few observations. On Burroughs. I think that the fairest characterization of Burroughs is this, the corruption of the presidential selection process is existential to the union. It characterizes it that way. And, therefore, corruption of the process cannot be exclusively state. Otherwise, it does recognize it as a state power because the text of Article II says that. The 90-day blackout period, another textual point. In Section A3 that says you shall not remove a voter unless one of the following applies.  Registrant. Later in the exact same sentence, it describes it as an eligible voter. It uses the word eligible in A3. Your Honor had asked about Hippocratic medicine. One of the things that you'll notice in the transcript if you look is that for every organizational plaintiff that took the stand to describe their basis for standing, they were asked the exact same question. All of them were asked the same question. It was this. Are you aware of anyone in the state who is an adult citizen residing here and does not have Deepak? Have you ever found someone like that? And the total number of people they identified with all 60 lawyers and, you know, a year and a half of work was zero. It is the idea that they're diverting resources, as Hippocratic medicine says it's speculative and attenuated, with no apparent injury is really startling. One final observation. I have found this puzzling in the case. Both the district court and the plaintiffs repeatedly in their depositions and ultimately the ruling make the point that the county has never done this before, so it must be useless. You know, they haven't used birthplace before. It must be useless, et cetera. It's puzzling to me because, first of all, the laws have never been implemented. There would be no cause to use it before. But second, that sort of silver bullet argument could kill every election reform. You could say it about Crawford. Voter ID in Indiana was never used before you had to use it. Therefore, it's illegal, right? Burnabish, you never had a ban on ballot harvesting until you did, so therefore you don't need it. That can't be the proper approach. It's not the doctrine. It's sort of a rhetorical gimmick, let's say. Unless there are questions, I'll sit down. All right. Thank you, counsel.  The familiar vote versus Arizona is submitted, and this session of the court is adjourned for today. All rise.
judges: WARDLAW, GOULD, BUMATAY